POOLER, Circuit Judge,
dissenting:
The majority opinion misconstrues the plain language of a statute and reaches an incorrect result. Because I believe we are bound by the text of the enactment, I am constrained, respectfully, to dissent.
We are called upon in this case to apply certain provisions of the Class Action Fairness Act of 2005 (“CAFA”), Pub.L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.). There is no dispute that CAFA’s general purpose is to significantly expand federal court jurisdiction over multistate class action litigation. As United States District Judge Sarah S. Vance, of the Eastern District of Louisiana, has commented, “CAFA represents the largest expansion of federal jurisdiction in recent memory.” Sarah S. Vance, A Primer on the Class Action Fairness Act of 2005, 80 Tul. L.Rev. 1617, 1643 (2006). CAFA, however, contains certain exceptions to the expansion of federal jurisdiction over multistate class actions. I believe that one of these exceptions, by its plain terms, is applicable to the instant case. By contrast, the majority appears to believe that CAFA contains little in the way of plain terms. That is, we are told of “the imperfect wording of the statute,” Opinion at 26; it is asserted that “the imperfect drafting of the statute makes it ambiguous,” id. at 30; and that we are “forced ... to construe ‘CAFA’s cryptic text,’ ” id. at 32 (quoting Lowery v. Alabama Power Co., 483 F.3d 1184, 1187 (11th Cir.2007)). But I fear that a reader of the majority’s opinion must be forgiven if he or she comes to the conclusion that the generally opaque quality of CAFA has been merely asserted rather than demonstrated. More importantly, with respect to the specific provision of CAFA that I *34 believe governs this case, I expect that this reader may conclude that the majority has simply departed from the statutory text in favor of a dubious consideration of the supposed legislative intent of the statute’s drafters. Accordingly, and respectfully, I am compelled to dissent. ■
I. The Applicability of 28 U.S.C. Section 1332(d)(9)(C).
I agree with the majority that the central issue on this appeal is the exception, now codified at 28 U.S.C. Section 1332(d)(9), which states that CAFA’s broad grant of federal court jurisdiction over multistate class action litigation “shall not apply to any class action that solely involves a claim
(A) concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(8)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb (f)(5)(E));
(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized, or
(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).”
I agree with the majority that the exemption to federal jurisdiction set forth in 28 U.S.C. Section 1332(d)(9)(A) is not applicable here. That provision’s reach is expressly limited to claims involving “covered securities] as defined under 16(f)(3) of the Securities Act of 1933.” As recognized by the district court, “covered securities” as defined by the Securities Act are “securities that are traded nationally or listed on a regulated national exchange. See 15 U.S.C. § 77r(b), cited in 15 U.S.C. §§ 77p (f)(3); 78bb (f)(5)(E).” Pew v. Cardarelli, 2006 WL 3524488 at *5 (N.D.N.Y.2006). There is no assertion by either of the parties that the Agway Certificates are traded nationally, nor that they are they listed on any national securities exchange.
I also agree with the majority regarding the inapplicability of Section 1332(d)(9)(B). That section speaks of suits relating to “the internal affairs or governance” of the firm against which the suit is brought. The claims asserted by the plaintiffs here only go to the integrity of their investment in the Agway Money Market Certificates (“the Certificates”); they do not seek to alter the course of Agway’s management. Our disagreement is therefore over the proper construction of the terms of 28 U.S.C. Section 1332(d)(9)(C).
The majority correctly asserts that Section 1332(d)(9)(C) “cannot be read to cover any and all claims that relate to any security. ...” Opinion at 31. For example, as the defendants argue, if Congress had intended for “a standard misrepresentation claim to come within § 1332(d)(9)(C), it could have simply provided that the exception applied to any claim relating to ‘a security’ (or relating to ‘the purchase or sale of a security’). There would have been no need for Congress to add the words that the exception applies only to a claim relating to ‘the rights, duties ... and obligations relating to or created by or pursuant to any security.’ ” Defts.’ Br. at 12-13 (emphasis in original). If we examine the securities at issue in this ease, however, it is readily apparent that the instant suit in fact relates to rights and obligations created by, or at least relating to, those securities.
*35 The majority correctly identifies the Certificates as “unsecured, fixed-interest debt instruments.” Opinion at 27. More specifically, the plaintiffs assert that, by issuing the Certificates, Agway undertook the obligation to repay purchasers’ principal at maturity dates between October 31, 1998 and October 31, 2013, and to pay interest until maturity at stated rates between 4.5% and 9.5%. Complaint ¶ 63.[1] The plaintiffs’ central allegation is that Agway had degenerated into “a classic ‘Ponzi’ scheme” which could only meet its ongoing payment obligations to holders of the Certificates through the irresponsible issuance of new Certificates. Complaint ¶¶ 2, 3. The complaint alleges that
Agway was insolvent from the beginning of the Class Period, because the value of its assets during that time ... was insufficient by several hundred million dollars to discharge its Money Market-Certificate-related liabilities, and the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates sold and maturing during and after the Class Period was other peoples’ money — from the sale of hundreds of millions of dollars of new Money Market Certificates to plaintiffs and other unsuspecting investors.
Complaint ¶ 3 (emphases in original). Thus, it is alleged that Agway fraudulently concealed the fact that it could not meet its unqualified obligations with respect to the Certificates, i.e., that the plaintiffs were fraudulently deprived of their right to repayment of the principal component of their investment:
[T]he new Money Market Certificates purchased by plaintiffs ... had no possibility of ever being fully repaid. To the contrary, aside from the money of plaintiffs and other hapless investors, ... the only possible source for Agway’s satisfaction of any portion of the principal amount of the new Money Market Certificates ... was the dismantling and sale of Agway’s most valuable remaining business segments---- But these valuable assets would never be available in connection with the more distant maturities of the new Money Market Certificates ... because the assets would have to be disposed of to meet Agway’s presently existing obligations with respect to the hundreds of millions of dollars of previously sold Money Market Certificates maturing during and shortly after the Class Period.
Complaint 115 (emphases in original).
In light of these allegations, the applicability of the Section 1332(d)(9)(C) exemption appears to me to be obvious. By issuing the Certificates, Agway took on an obligation to pay interest and principal to the purchasers of the Certificates. These purchasers therefore possessed a corresponding right to receive these payments. The instant suit plainly concerns Agway’s failure to fulfill its obligations with respect to the Certificates and the plaintiffs’ consequent deprivation of their rights with respect to the same. If this suit therefore does not solely involve a claim “that relates to the rights ... and obligations relating to or created by or pursuant to” the Certificates, I am at a loss to understand why.[2]
*36 II. The Majority’s Failed Effort to Deny the Applicability of Section 1332(d)(9)(C).
An odd feature of the majority’s opinion is that it explicitly acknowledges the initial premise of the argument just made. That is, the majority writes that the Certificates “certainly create ‘obligations,’ and therefore corresponding ‘rights’ in the holders.... [T]he Certificates create rights in the holders to a rate of interest and to principal repayment at certain dates.” Opinion at 31. But then the majority takes an idiosyncratic turn:
But the present suit does not “relate [ ] to” those rights; rather, it is a state-law consumer fraud action alleging that Ag-way fraudulently concealed its insolvency when it peddled the Certificates. Claims that “relate [ ] to the rights ... and obligations” “created by or pursuant to” a security must be claims ground in the terms of the security itself, the kind of claims that might arise where the interest rate was pegged to a rate set by a bank that later merges into another bank, or where a bond series is discontinued, or where a failure to negotiate replacement credit results in a default on principal. The present claim — that a debt security was fraudulently marketed by an insolvent enterprise — does not enforce the right of the Certificate holders as holders, and therefore it does not fall within § 1332(d)(9)(C)....
Id. at 32.
Now there are a host of comments that could be made about this passage. For example, the phrase “Certificate holders as holders” seems to be without sense. Further, one wonders why a suit involving “a failure to negotiate replacement credit [which] results in a default on principal” would fall within the purview of Section 1332(d)(9)(C), but a suit, such as the present one, involving the fraudulent marketing of debt securities which results in a default on principal, does not. But the most important thing to be said about the passage is that it constitutes a wholly inexplicable departure from the plain text of Section 1332(d)(9)(C).
Thus, the majority’s recitation of what claims “must be” in order to fall within the Section 1332(d)(9)(C) is purely its own invention. The terms of the Section itself merely say, without qualification, that claims which “relate [ ] to” the “rights”— another term which is unqualified — of securities holders are exempted from CAFA’s scope. I can only conclude that the majority’s specifications as to what claims “must be” in order to qualify for exemption is an act of judicial re-drafting of CAFA. We frequently hear, however, that “legislating from the bench” is a cardinal sin of the judicial profession.
Further, the majority’s assertion that this suit is “a state-law consumer fraud action” is of no moment. If the plaintiffs were challenging a bank merger, or the discontinuance of a bond series, or a failure to negotiate replacement credit, such actions would presumably be brought under state corporate law. But the terms of CAFA simply do not contain any indication that this distinction has any import whatsoever. Under those terms, all that matters is that the suit is one in which securities holders are seeking the enforcement of rights created by, or relating to, the securities they hold. If this condition is met, our inquiry is finished.
The majority’s attempt to justify its eccentric reading of Section 1332(d)(9)(C) is *37 left to rest upon dubious legislative intent. Specifically, it is noted that the Senate Report relating to the passage of CAFA “demonstrate[s] that Congress intended that § 1332(d)(9)(C) ... should be reserved for ‘disputes over the meaning of the terms of a security,’ such as how interest rates are to be calculated, and so on.” Opinion at 33 (quoting S. Rep. 109-14, at 45 (2005)). But the majority acknowledges that “[t]his Circuit has expressed some skepticism as to the ‘probative value’ of [this] Senate Report because it was issued after CAFA’s enactment....” Id. at 32 (quoting Blockbuster, Inc. v. Galeno, 472 F.3d 53, 58 (2d Cir.2006)). The majority appears to believe this skepticism is cured by the views of the Eleventh Circuit. Id. For my part, I believe that the Seventh Circuit fully justifies our skepticism with its observation that the report in question “has no more force [as a source of legislative intent] than an opinion poll of legislators^ — -less really, as it speaks for fewer. Thirteen Senators signed this report and five voted not to send the proposal to the floor. Another 82 Senators did not express themselves on the question; likewise 435 Members of the House and one President kept their silence.”' Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 448 (7th Cir.2005).
Far more importantly, the Senate Report’s assertion that the scope of Section 1332(d)(9)(C) is limited to suits involving disputes over the terms of securities simply has no relation to the enacted text. As already noted, that text unambiguously exempts from CAFA’s reach suits involving claims of “rights ... and obligations” “created by or pursuant to” a security and contains not a word suggesting that these terms are limited in the manner asserted by the majority. In such circumstances, the Supreme Court has instructed us that it would be improper for us to consult legislative history as to the meaning of the statutory provision at issue:
We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.
Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (internal quotation marks omitted).[3]
III. A Concluding Observation.
Writing almost ninety ago, a wise and revered judge noted that statutes are “designed to meet the fugitive exigencies of the hour.” Benjamin N. Cardozo, The Nature of the Judicial Process, 83 (1921). Because they are enacted under such circumstances, he concluded that it sometimes happens that “gaps” appear between the statutory language and the facts presented by a given case. In such situations, he asserted that judges, in order to reach decisions, have the discretion to apply the statutory language in a manner which effectively adds to or subtracts from the *38 existing text as if the judge were acting as a legislator. He cautioned, however, that judges should not get carried away in this regard:
In countless litigations, the law is so clear that judges have no discretion. They have the right to legislate within gaps, but often there are no gaps. We shall have a false view of the landscape if we look at the waste spaces only, and refuse to see the acres already sown and fruitful.
Id. at 129.
I believe the application of CAFA to the facts of the instant ease leads to the straightforward conclusion that the district court correctly held that the case should be remanded to state court. In other words, no gap exists. By contrast, I believe that the majority has ignored the plain terms of CAFA, created its own waste space, and filled in the resulting gap with an unwarranted exercise of legislative power. I must therefore respectfully dissent.

. Citations to the complaint refer to the state court complaint, filed on September 22, 2005, in the Supreme Court of the State of New York for the County of Onondaga.

. Although there are still few cases considering Section 1332(d)(9)(C), I note that one district court has held that the exemption applies in cases involving rights of payment to the holders of debt securities. See Genton v. Vestin Realty Mortg. II, Inc., 2007 WL 951838 at *3 (S.D.Cal. Mar.9, 2007) (“Plaintiffs' ... claims arise directly from Vestin Realty's al *36 leged failure to pay Plaintiffs their pro rata share as security owners in Vestin as required by the Operating Agreement.”).

. I believe that it is important to note that the majority does not assert that the inapplicability of Section 1332(d)(9)(C) to this case has anything to do with the merits of the plaintiffs’ claims. The majority is wise to avoid any such assertion. Although it is true that CAFA was enacted upon an express finding by Congress that "there have been abuses of the class action device,” 28 U.S.C. Section 1711(a)(2), the substantive terms of the statute are wholly jurisdictional; they afford the federal courts no authority to use CAFA as a vehicle for dismissing suits considered to be meritless. In sum, we have only decided here that federal jurisdiction exists and we "remand [this] case to the district court for further proceedings,” Opinion at 33, without any instruction as to how it should decide the merits of the plaintiffs’ claims.